IOWA GATEWAY, INC., An Iowa Corporation, Appellee,

v.

INTERSTATE POWER COMPANY, A Delaware Corporation, Orba-Johnson Systems, Inc., an Iowa Corporation, Orba Corporation, a Delaware Corporation, Johnson Bros. Corporation, a Minnesota Corporation, and Orba-Johnson Transshipment Company, an Iowa Joint Venture, Orba Transshipment of Iowa, Inc., an Iowa Corporation, and Johnson Bros. Transshipment Corporation of Iowa, Inc., an Iowa Corporation, Appellants.

No. 83–138.

Supreme Court of Iowa.

May 16, 1984.

Rehearing Denied June 8, 1984.

David L. Hammer and Les V. Reddick of O'Connor, Thomas, Hammer, Bertsch & Norby, Dubuque, for appellant Interstate Power Co.

Gene Krekel of Hirsch, Link, Adams, Hoth & Krekel, Burlington, and Thomas Tinkham of Dorsey & Whitney, Minneapolis, Minn., for appellants Orba-Johnson Systems, Inc., Orba Corp., Johnson Bros. Corp., Orba-Johnson Transshipment Corp., Orba Transshipment of Iowa, Inc., and Johnson Bros. Transshipment Corp. of Iowa, Inc.

Lex Hawkins and Glenn L. Norris of Hawkins & Norris, Des Moines, Ruth E. Walker, Keokuk, and John H. Smith of Dickey, Smith & Kultala, Keokuk, for appellee Iowa Gateway, Inc.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, McGIVERIN, and LARSON, JJ.

LARSON, Justice.

This is an interlocutory appeal from equity rulings in a bifurcated trial involving ownership rights in a transloading facility on the Mississippi River. The district court reserved the law issues for later disposition. The critical issue on appeal is the effect of Iowa Gateway, Inc.'s attempted exercise of an option to repurchase the facility. We conclude the attempted exercise was invalid and therefore reverse on that issue. Other rulings, controlled by our ruling on the exercise of the option, are affirmed. The remaining issues are remanded for trial.

The events leading up to this litigation began in 1973, when Interstate Power Company entered into a long-term contract for a large supply of western coal for electric generation. Interstate is an electric utility furnishing power for portions of Iowa, Minnesota, and Wisconsin, operating a generating plant at Lansing, Iowa, where this coal was to be used.

In 1975, Interstate began to look for a rail/barge transloading site or facility on the Mississippi River to unload coal from railroad cars and load onto barges for shipment upstream to Lansing. At that time, Gateway owned and operated a small transloading and storage facility at mile marker 371, in Lee County. It had the

necessary permits, apparently, to construct such facility as Interstate envisioned and had begun investigation on its own of the possibilities of enlarging its transloading facility. Gateway's location on the river and its possession of these permits were valuable to this project. There was some evidence that Gateway, in fact, had the only viable location for such a facility between mile marker 371 and the Lansing plant upstream in Allamakee County. As it later developed, Gateway's site and permits were virtually its only assets. At the suggestion of Burlington Northern Railroad, which was shipping the coal to Interstate, the two parties got together.

In 1975, Interstate and Gateway executed a "nonbinding" letter of intent concerning the construction of this facility. Then, in November 1976, a "binding," letter of intent was executed between the parties.

Gateway began searching for financing, using Interstate's letter of intent as collateral. Financing for the project was no small matter, however, as the estimated cost of the project was in excess of $30 million.

In December 1976, a potential financing meeting was held by Interstate, Gateway, Manufacturer's Hanover Trust, and the First National Bank of Chicago. The lenders wanted Interstate to guarantee any loan to Gateway. Interstate refused. (Interstate's refusal to guarantee any such loan continued to be a major obstacle to Gateway's loan arrangements. The reason for Interstate's refusal was that a guarantee might be required by federal regulatory rules to be shown on its balance sheet as a liability, which could result in a downgrading of its bond rating thereby raising the cost of its own financing.)

When the prospects for Gateway's financing appeared dim, a meeting was held by Gateway, Interstate, Orba Corporation and Johnson Brothers Corporation to discuss a "turnkey" construction plan. Under such a plan, the construction contractor would provide the financing during construction and, on completion, would turn the property over to the permanent owner, who would "take out" the construction lender by arranging its own financing. (Johnson Bros. is a construction contractor which had had previous experience in building transloading facilities and Orba is an engineering firm which had had previous experience in their design. Orba and Johnson later formed separate entities known as Orba-Johnson Transshipment Company, Orba Transshipment of Iowa, Inc., and Johnson Bros. Transshipment Corporation of Iowa, Inc., for purposes of owning and operating the facility. These entities are named as separate defendants in this action, but for our purposes, we will collectively refer to them in most instances as "Orba-Johnson.") A turnkey approach was agreed upon, and Orba-Johnson was selected to design and build the facility.

In February, 1977, Gateway, Interstate, and Orba-Johnson drafted a "coal contract," a document which figures prominently in this litigation. This contract provided that a transloading facility would be built by Gateway, that Gateway would transload coal for Interstate and other customers, and that Interstate would pay a fee to Gateway calculated to pay the construction and operation costs of the facility. At about this time, Interstate learned of Gateway's precarious financial position, and it delayed the signing of the coal contract.

Gateway and Interstate, in the meantime, met to discuss bankruptcy and insolvency concerns. Interstate offered to purchase Gateway's assets; Gateway refused. The parties agreed that further negotiations would follow.

In June 1977, Gateway and Interstate executed an offer to purchase and first addendum. Gateway agreed to sell its property for $3,400,000. A release of all claims by both parties was incorporated in the agreement. The first addendum provided the February draft of the coal contract would be executed "as of the date hereof" and that Interstate would give Gateway an option to repurchase for $3,400,000 plus costs of construction.

Finally, in July 1977, Gateway and Interstate executed the coal contract which had been drafted in February, and a first addendum to it. They also executed a lease allowing Gateway to lease back its existing transloading and storage operation during construction of the coal facility. Other agreements, not bearing directly on the litigation, were also executed at about the same time.

On October 28, 1977, a closing was held on a purchase and sale agreement between Interstate and Gateway which superseded the prior offer to purchase and its addenda. Under the new agreement, (1) Gateway's assets were sold to Interstate or its nominee; (2) Gateway was to be given an option to repurchase; (3) Gateway released all prior claims against Interstate; and (4) the coal contract of February, 1977, under which Interstate was to pay Gateway for transloading the coal, was rendered inoperative unless Gateway exercised its option to repurchase.

Interstate and Orba-Johnson entered into a construction contract on December 13, 1977. Under this agreement, the estimated completion date for the transloading facility was June 30, 1979.

In February, 1978, Gateway and Interstate executed an option to repurchase pursuant to the purchase and sale agreement. It provided in relevant part:

Such Option of Iowa Gateway shall be exercised, if at all, by written notice of Iowa Gateway's election to exercise such Option, accompanied by letters of credit or firm commitments from financial institutions reasonably satisfactory to OJS and Interstate that funds for such repurchase will be available at closing, conditioned only upon OJS's [Orba-Johnson System's] full performance hereunder, being delivered to or served upon OJS on or before [60 days] prior to the estimated date of final completion (whether or not such final completion is accomplished when estimated).

(Under the December 13 construction contract, the "estimated date of final completion" as referred to in the option to repur-

chase, was June 30, 1979. Exercise of the option would thus have to be made on or prior to May 1, 1979.)

In March, 1978, actual construction of the project began.

In late 1978 and early 1979, initial discussions among Interstate, Gateway, and Prudential Insurance Company were held concerning financing for Gateway's repurchase. Prudential circulated several drafts of a "Preliminary Outline of Loan Terms" (POLT) setting out the requirements which must be met before the funds would be furnished. Prudential insisted upon being able to hold Interstate liable in the event of a default by Gateway. Interstate continued its refusal to act as guarantor, and the parties failed to reach an agreement.

In March, 1979, shortly before the option deadline, Gateway continued to seek financing, including from sources other than Prudential, but various problems arose.

On April 4, 1979, Prudential presented its final POLT, which Gateway signed. Interstate "acknowledged" receipt of the POLT but did not actually sign it. This POLT required a third addendum to the coal contract of February 1977 which would include a deficiency agreement and the equivalent of a guarantee by Interstate. Side letters of the same date from Gateway and its attorneys to Interstate confirmed the language in Interstate's POLT "acknowledgment" that Interstate was not bound by the language of the POLT.

This was the status of the loan arrangements when, on April 27, 1979, Gateway attempted to exercise its option to repurchase. With the notice of exercise sent to Interstate, Gateway furnished several documents from potential lenders which, it claims, amounted to the "letters of credit or firm commitments from financial institutions ... that funds for such repurchase will be available at closing" as envisioned in the option agreement. (The sufficiency of these accompanying documents is the focal point upon which the case turns. Gateway contends the exercise of option

complied with the agreement; the defendants argue it did not.)

Interstate rejected the tendered notice of exercise of the option on May 1, 1979, but on the following day, it advised Gateway that it was willing to continue working with Gateway in its attempt to secure financing. In doing so, Interstate advised that it was not waiving any of its rights under the option. Negotiations continued during May.

In July, 1979, the facility was completed, and Interstate accepted it on July 26. The following day, July 27, Interstate advised Gateway that, in light of Gateway's inability to secure financing, Interstate was unable to reconvey the property to it. (Under Interstate's agreement with Orba-Johnson, Interstate was required to purchase within ten days of completion unless Gateway exercised its option to repurchase. This ten-day period was almost up.) This suit by Gateway was filed the same day.

## II. *The Suit.*

Gateway's petition, as amended, contained nine equity and four law counts against all defendants (counts I to VI, XII and XIII were in equity; counts VII to XI were in law). Counts II, V and VI were dismissed by the trial court, and those rulings have not been appealed. Gateway has now abandoned its appeal as to count III. The following chart reviews the substance and status of the remaining counts:

| COUNT | GATEWAY'S CLAIM | DEFENSE | DISPOSITION AND STATUS ON APPEAL |
|---|---|---|---|
| I | Facility not complete; Gateway therefore has more time to exercise its option. Seeks declaratory judgment. | Failure to exercise option. | Dismissed on merits; Gateway cross-appeals. |
| IV | Action for declaratory judgment, specific performance, and other equitable relief under option. | Failure to exercise option. | Judgment against Interstate only; court refused to grant specific performance. All parties appeal. |
| VII—XI | Law counts seeking actual and punitive damages for breach of contract, fraud, and tortious interference with contract and business relationships. | Released; failure to exercise option. | Reserved for separate trial; defendants appeal, claiming the court should have dismissed these counts because they were tried by consent. |
| XII | Action to establish constructive trust for benefit of Gateway. | Failure to exercise option. | No ruling; trial court ordered this count to be set for jury trial with the law counts; all parties appeal. |

| COUNT | GATEWAY'S CLAIM | DEFENSE | DISPOSITION AND STATUS ON APPEAL |
|---|---|---|---|
| XIII | Part of facility constructed on land not controlled by OJS or Gateway. Seeks declaratory judgment and Inter-State's cure of title defects. | Failure to exercise option. | Dismissed on merits; Gateway cross-appeals. |

---

Orba-Johnson counterclaimed against Gateway to obtain possession of that part of the property previously leased to Gateway in order for it to conduct its existing business. Orba-Johnson also demanded liquidated damages of $3500 per day, as provided by the lease, for Gateway's alleged holding over. The district court entered no rulings on the counterclaim. Orba-Johnson requested enlargements of the court's order to enter such judgment, Iowa Rule of Civil Procedure 179(b), but the court refused. Orba-Johnson appealed this aspect of the case also.

The district court ruled in favor of Gateway on count IV, finding a valid exercise on the option, but refused to grant the affirmative relief requested by Gateway. This relief would have to await resolution of the law issues which have been preserved for later trial, according to the court. Gateway cross-appealed this ruling.

The court dismissed the defendants' affirmative defense that Gateway had lost its rights in the facility by failing to exercise its option to repurchase.

### III. *The Option Exercise.*

As previously noted, the pivotal issue is whether Gateway effectively exercised its option to repurchase the completed facility, and it is on this point primarily that we disagree with the district court.

The option itself has been set out above. The key requirement is that the notice of exercise be accompanied with "letters of credit or firm commitments" from lenders "that funds for such repurchase will be available at closing." Gateway did not submit letters of credit with the notice of exercise; the question thus is whether the accompanying documents were "firm commitments" under the meaning of the option.

■ The option itself did not define "firm commitments," however, a pretrial stipulation by the parties provided this definition of the term: A "Unilateral offer to loan money on definitely ascertainable terms, not subject to change, which is accepted by the borrowers complying with the lender's terms, at which point the lender is bound to lend." While Gateway has since disassociated itself from this definition, we believe it is accurate and reflects the basic legal requirements for any contract. *See, e.g.,* A. Corbin, *Contracts* § 95, at 393–410 (1963).

■ Gateway's "firm commitments" for financing were from four potential lenders: Prudential, Central National Bank, Farmers Home Administration (FmHA), and an entity related to Gateway called Coal Limited Partnership. In order for Gateway to repurchase, the combined funds from all of these sources would have been required. In our view, it is doubtful that the "commitments" from any of them were sufficient to comply with the requirements of the option. That the most important commitment, that from Prudential, for "up to" $25 million, did not comply is obvious.

Prudential's letter of April 25, 1979, which Gateway submitted as a commitment, stated in part:

Consummation of this financing will be subject to: (a) The execution by Iowa Gateway, Coal Gateway, and Prudential of a mutually satisfactory Note Agreement; (b) the execution of an amendment to the Coal Contract between Iowa Gateway and Interstate Power Company in a form consistent with that proposed in the Preliminary Outline of Loan Terms [POLT] dated April 4, 1979; (c) Prudential's receipt of certain opinions from Interstate Power Company outlined in Condition 8 of the same Preliminary Outline of Loan Terms; (d) Prudential's receipt of a satisfactory opinion of Prudential's Special Counsel; and (e) the satisfaction of all other conditions contained in the Preliminary Outline of Loan Terms. As we have previously discussed, the form and substance of all such legal documentation and opinions must be satisfactory to Prudential's Law Department and Prudential's Special Counsel.

It is clear from this language and from the testimony at trial that Prudential would not lend unless Interstate agreed to the POLT. This Interstate had consistently refused to do. Interstate repeatedly refused to enter into a third addendum to the Coal Contract (as outlined by Prudential) or any other agreement amounting to a guarantee requiring regulatory approval.

As previously noted, under Gateway's attempted exercise, it was necessary to show binding commitments from all four potential lenders; if funds from one or more source did not materialize, Gateway's financing package would fall apart. There are other problems with those commitments, which the defendants have raised, but which we need not discuss. In our view, the problems with the Prudential loan which we have discussed were sufficient to render their commitments unenforceable by Gateway and not in compliance with the requirements of the option. For this reason, it is unnecessary to discuss the claimed inadequacy of the Central National, FmHA and Coal Limited Partnership commitments.

It was error to conclude, as the district court did, that the attempted exercise of the option was sufficient. We conclude that, by its failure to provide evidence of firm commitments for financing, Gateway lost its right to repurchase, and we therefore reverse the district court's ruling in favor of Gateway under count IV of its petition.

The question remaining is whether this conclusion necessarily disposes of all of the other issues, as Interstate and Orba-Johnson argue.

IV. *Remaining Issues.*

A. *Count I.* In this count, Gateway argued it was not required to exercise the option by May 1, 1979, because it was required to be exercised 60 days from the completion of the facility, and it was actually completed on July 18, not June 30, 1979, as originally estimated. Gateway argues its time for exercising the option was extended accordingly. The district court dismissed this claim, and Gateway cross-appealed. We affirm on this issue.

■ The option by its terms, was to be executed 60 days prior to the estimated date of completion, not from the date of actual completion. The estimated date of completion under the construction contract was June 30, 1979, and the record is quite clear that Gateway was aware of that fact.

■ Even if a later date were to be determinative, Gateway could not prevail under this argument; the attempted exercise of the option as we have concluded was ineffective. It was no more effective 60 days before the actual completion than it was at the earlier date when it was submitted. Although negotiations with lenders continued during this period, no firm commitments were received which would comply with the option requirements.

B. *Counts VII—XI.* Under these counts, Gateway sought damages, both actual and punitive, for breach of contract, fraud, and tortious interference with contract and business relationships. The defendants responded that Gateway's failure to exercise the option meant that they had

no interest in the facility which could be the subject of such suit and, in any event, Gateway had released all such claims arising before October 28, 1977, the date upon which Gateway executed a release as a part of its purchase and sale agreement with Interstate, Orba, Johnson Bros., and Orba-Johnson. These counts were filed at law. The district court refused to rule on these claims, reserving them for later disposition in the law phase of the bifurcated trial. The defendants appeal from that ruling, raising the same issues as presented by the pleadings: Gateway's failure to exercise the option and the release. The defendants argue that these issues, while they were at law, were nevertheless tried by consent and that Gateway has waived its right to a jury trial on them. They argue that the district court should have resolved these issues as a part of the equity hearing.

■ The defendants ask us to dispose of these issues, despite the refusal of the district court to rule on them. As we have recently noted, however, "[i]f we were to do so, we would not be performing our review function; we would be deciding issues that were not decided by the district court. This would be contrary to our function as a court of review." *Iowa-Illinois Gas and Electric Co. v. Iowa State Commerce Commission*, 347 N.W.2d 423, 427 (Iowa 1984).

■ While the district court ruled on the validity of the purchase and sale provisions of the parties' agreement, it did not, as the defendants argue, necessarily rule on the effectiveness of the release contained in that agreement. We cannot assume that our conclusion that Gateway failed to validly exercise its option necessarily compels a holding that the damage claims must also fail. Under the very broad damage claims in counts VII to XI of Gateway's petition, even if Gateway had lost all rights to the property itself by its failure to exercise the option, it would not necessarily be precluded from such recovery.

We will allow the district court to resolve the effect of our ruling on the validity of the option exercise, and the release, on remand. This aspect of the defendants' appeal is affirmed.

■ C. *Count XII.* Gateway requested imposition of a constructive trust for its benefit in this count, and the defendants asserted Gateway's failure to exercise the option as a defense. The district court refused to rule on this issue, reserving it for later jury trial with the law issues. The rationale of that ruling is unclear, in view of the fact that an action to impose a constructive trust is generally held to be recognized only in equity. *See First National Bank v. Curran*, 206 N.W.2d 317, 320 (Iowa 1973); *Markworth v. State Savings Bank*, 212 Iowa 954, 964, 237 N.W. 471, 475–76 (1931). Nevertheless, that is the present status of this claim. Again, we decline to pass on this count when there was no ruling in the district court, and we remand for disposition of that issue. While our conclusion in division III that Gateway failed to exercise its option to regain ownership might well have a bearing on this issue, we do not agree with the defendants that this necessarily controls the constructive trust issue on appeal.

D. *Count XIII.* The last count of Gateway's petition involved on appeal seeks a declaratory judgment and seeks to require Interstate to cure alleged title defects, asserting that part of the facility was constructed on land not owned or controlled by either Orba-Johnson or Gateway. Again, the defense was Gateway's failure to exercise the option. The district court dismissed this count, and Gateway cross-appeals.

■ Our decision under division III controls on this issue. Upon Gateway's failure to validly exercise its option, its interests in the property expired unless, of course, it is successful in imposing a constructive trust in future proceedings. Any supplemental relief in that case would have to be addressed to the district court. Under the present status of the appeal, we affirm the dismissal of this count.

V. *The Counterclaim.*

The defendant Orba-Johnson sought an order for possession and liquidated dam-

ages for Gateway's alleged holding over under its lease. The district court entered no ruling on the counterclaim, and Orba-Johnson appealed.

Orba-Johnson asks us to pass on this matter, despite the fact the district court refused to do so. For the reasons discussed in division IV(B) of this opinion, we decline to do so.

VI. *Disposition.*

In sending the case back for trial on the issues still remaining, we are mindful of the defendants' concerns that this will very likely require a rehash of much of the evidence presented in the first portion of the bifurcated trial. That portion was a marathon, consuming over eight months of time and compiling a transcript exceeding 16,000 pages. While we are sensitive to that concern, we still cannot overstep our role as a court of review. Accordingly, the case must be remanded for further proceedings in conformance with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.